**Petition for NATURALIZATION of Abraham SPAK.**

No. 204934.

United States District Court
E. D. Pennsylvania.
July 24, 1958.

George Gershenfeld, Philadelphia, Pa., for petitioner.

William J. Cochrane, Philadelphia, Pa., for Immigration & Nationality Service.

VAN DUSEN, District Judge.

This case is before the court on petitioner's application for naturalization, which is resisted by the Immigration and Naturalization Service on the ground that he had failed to establish that he was a person of "good moral character" during the five years preceding the filing of his petition within the meaning of § 316(a) of the Immigration and Nationality Act of 1952 (8 U.S.C.A. § 1427 (a)). At the hearing on the petition, petitioner and his present wife testified on his behalf in open court.[1] The respondent offered in evidence Findings of Fact, Conclusions of Law and Recommendation of the Designated Naturalization Examiner, together with certain correspondence, transcripts of hearings, and reports, all of which were marked P-1. Counsel for the respondent also summarized certain admissions made by the petitioner during the hearings, without contradiction by petitioner or his counsel.[2]

---

1. The function of the District Judge when such testimony is offered is described in Application of Murra, 7 Cir., 1948, 166 F.2d 605.

2. The right of counsel for the respondent to make such an unsworn statement is described in Petition of Rudder, 2 Cir., 1947, 159 F.2d 695, 697, citing United

From the record, the hearing judge makes the following:

## I. Findings of Fact

A. Petitioner is an alien, being a 38-year old native and national of Poland.

B. He married Lutka Spak (also known as Libby Spak) in Germany in 1946 and they had two children. One daughter, Chana (also known as Hana and Anna) Spak, was born in Frankfurt Am/M, Germany, on January 29, 1949, and is mentally deficient. The other daughter was born in Louisiana in November 1951.

C. Petitioner, his first wife Lutka, and his daughter Chana were lawfully admitted to the United States of America at New Orleans, Louisiana, for permanent residence on February 26, 1950.

His petition for naturalization was filed in this court on July 20, 1955.

D. On October 26, 1951, while living in Louisiana, petitioner and his first wife signed a maintenance and clothing agreement stating that "in consideration of Chana Spak being admitted to the State Colony and Training School" (Pineville), they "hereby promise to pay the said institution, monthly, the sum of $10 for support and maintenance of said inmate * * * (and) pledge themselves to provide all clothing necessary for the health and welfare of said inmate, or to pay for the same if provided by said school" (see Exhibit E attached to P–1).

E. About February 1952, Chana Spak was placed in the custody of Jewish Family Service, Shreveport, La.,[3] and petitioner had neither seen his daughter nor made any effort to contribute to her

support between that time and December 1956. The Jewish Family Service apparently placed the child in the custody of the State Colony and Training School about March 1, 1952.[3]

F. Petitioner never paid any amount to any agency for the State of Louisiana for either maintenance or clothing of his daughter until after continued preliminary examination of petitioner (at which he was represented by an attorney, was duly sworn, and was advised of his rights) on June 15, 1956, conducted by an examiner of the Immigration and Naturalization Service at Philadelphia, at which he was advised that he might have a legal responsibility for support of the child (see page R–9 of Notes of Testimony of 12/4/56, examination attached to P–1). Petitioner admitted that he knew he was primarily responsible for Chana's support, but thought that the Jewish Family Service had agreed to pay for such support if he could not afford to do so. In fact, the Jewish Family Service had not made such an agreement.

G. Petitioner and his wife separated in 1952 and were subsequently divorced, about which time a court order was entered requiring petitioner to pay $40 a month for the support of his second child.

H. Petitioner had an abdominal operation in the winter of 1952 and in the spring of that year came to Philadelphia to live with a brother while recuperating. Petitioner testified before the examiner that his doctors in Philadelphia advised him to forget about the past and to start a new life as much as possible. Petitioner has offered no testimony of doc-

States v. Saracino, 3 Cir., 1930, 43 F. 2d 76, 77.

3. Petitioner testified that his child, Chana, went to the "institution" in February 1952, but stated that the arrangements were made by the Jewish Family Service (apparently now known as Jewish Welfare Board; see letter of 11/26/56 attached to P–1). The report of 11/19/56

from the New Orleans District of Immigration and Naturalization Service, attached as Exhibit C to P–1, states, in the last paragraph on page 2, that Chana was admitted to the State Colony and Training School, Pineville, La., on 3/3/53. The letter of 11/2/56 from the School to Petitioner (attached to P–1) indicates this date should be 3/3/52.

tors, either before the examiner or to the hearing judge.

I. Petitioner had irregular work in Philadelphia in the latter part of 1952 and his federal income tax returns for the years 1952 to 1956 [4] disclose the following:

| Year | Adjusted Gross Income | Deductible Expenses | Income Tax |
|------|----------------------|---------------------|------------|
| 1952 | $1,563.51 | $539.31 [5] | $ 94.17 |
| 1953 | 5,111.46 | Standard Deduction | 823.00 [6] |
| 1954 | 3,798.06 | Standard Deduction | 367.55 [7] |
| 1955 | 3,869.17 | $400.37 [8] | 325.33 [7] |
| 1956 | 5,127.05 [9] | Standard Deduction | 568.87 [7] |

J. In addition to the above items of taxable income, petitioner received between $700 and $1,000 in 1954 from the German government and, since 1957, he has been receiving a pension of between $27 and $29 a month from that government, which pension he will receive for the rest of his life.

K. In 1954 he married Merion Spak and they had a son born in 1955. When he bought his business in 1956, he had about $2,000 in an account in the Philadelphia Saving Fund Society.

L. Proposed monthly expenses of $416.50, based on estimated monthly net income of $425 (based on 1956 adjusted gross income of $5,100), are attached to these Findings of Fact. These expenses were submitted by petitioner and provide for payment of $40 per month to petitioner's younger daughter and $15 per month to his older daughter.

M. Petitioner had evidenced no interest in his daughter Chana between February 1952 and late 1956. When asked by the Immigration and Naturalization Examiner about this child in 1956, he only knew that she was in a public institution in Louisiana but did not know where she was. He never made inquiry as to how her condition was progressing or how she was maintained without his support. He never advised the institution of his whereabouts.

N. Petitioner could have afforded to pay at least $10 a month for the support of Chana since January 1, 1953.

O. Since December 1956, petitioner has been paying $15 a month to the State of Louisiana for the maintenance and clothing of his daughter Chana.

II. Discussion

■ The standards to be applied in determining whether a petitioner has established that he is a person of good moral character have recently been so clearly and fully stated by Chief Judge Ganey in his well-documented opinion, In re Mayall's Naturalization, D.C.E.D. Pa.1957, 154 F.Supp. 556, 560, that there is no need to cite additional authorities

4. Petitioner's testimony indicated that he had received less income than that shown by these returns, which were submitted at the hearing judge's request after the hearing.

5. $78.18 of additional medical expenses were deducted in arriving at this figure, being 5% of adjusted gross income.

6. This was tax paid to a foreign country which petitioner claims resulted in no federal income tax being payable.

7. Joint return with second wife, Merion Spak, who has assisted petitioner in the conduct of his business.

8. $139.44 of additional medical expenses were deducted in arriving at this figure, being 3% of adjusted gross income.

9. In 1956, taxpayer had over $9500 of gross income from his business and in 1955 he had over $7400 of such gross income.

to show that Mr. Spak's character must coincide with the generally accepted mores or standards of the average citizen of this community where he resides, and, if it does not so coincide, his conduct must be such as to be in accordance with the "common conscience" of the country as a whole.

Applying the community test, it is clear that the average man of good will of this community considers that a father has both a legal and moral obligation to support and clothe his children.[10] See 18 P.S. § 4733. Also, the common conscience of this country has included, at least since 1940, an obligation on parents to provide both material and spiritual needs for children. As stated by Chief Judge Gourley, of the United States District Court for the Western District of Pennsylvania:[11]

"A husband and father has not only a moral and marital obligation in the eyes of God to provide for a wife and child, but an absolute legal obligation to make or provide proper maintenance and care."

Cf. United States v. Konevitch, D.C. M.D.Pa.1946, 67 F.Supp. 250, 252.

■ Petitioner contends that there are extenuating circumstances which

justify his failure to support and show any interest in his child between February 1952 and November 1956. The hearing judge can find no extenuating circumstances which would justify either his failure even to find out the condition of his child and whether she was, in fact, being supported and maintained during this three-and-a-half-year period or his failure to contribute anything to her support and maintenance during this period.[12]

### III. Conclusions of Law

■ 1. In determining the good moral character of a person for a period as required by law, all of the facts must be considered and the standard must be considered together with any extenuating circumstances surrounding thereto.

2. The petitioner has not established that he was a person of "good moral character" for a period of five years immediately preceding the date of the filing of his petition for naturalization within the meaning of those terms as used in Section 316(a) of the Immigration and Nationality Act.

3. The petition for naturalization will be denied, without prejudice to petitioner's right to file another petition for naturalization at a later date.[13]

10. With the present laws in many of our communities providing fines for parents whose children disobey the curfew regulations, it would appear that this obligation to one's children is far broader, but it is not necessary to decide this on this record. See, for example, Ordinance of Philadelphia City Council, incorporating Bills Nos. 557 and 718, approved January 26, 1955; Curfew Ordinance for the Borough of Norristown, approved by Council July 1, 1958, approved by Burgess, July 8, 1958.

11. In re Mogus, D.C.W.D.Pa.1947, 73 F. Supp. 150, 152.

12. See finding of Fact N. The cases relied on by petitioner (see paragraph B

of his Requests for Conclusions of Law) are inapplicable to the situation presented by this record. While the trial judge is not unsympathetic with petitioner's medical problems, it is noted that Jewish welfare agencies have been of substantial aid to this petitioner and it is inconceivable that the importance of the family obligations of a father, whch are so important in the Jewish tradition, have been unknown to him.

13. See Finding of Fact O and petitioner's letters to the school of 11/9/56 and 11/23/56, attached to P–1, indicating petitioner's good moral character since December 1956. See Petition of Zele, 2 Cir., 1944, 140 F.2d 773.