### In re Petition for Naturalization of Hassan Mirshah VALAD.

### Civ. A. No. 78–1063–A–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Feb. 7, 1979.

Robert N. Herman, Gen. Atty., Naturalization, Designated Naturalization Examiner, Washington, D. C., for Dept. of Naturalization & Immigration.

James D. Hundley, Richmond, Va., for petitioner.

## MEMORANDUM

MERHIGE, District Judge.

This matter comes before the Court for final hearing on the petition of Hassan Mirshah Valad for naturalization pursuant to 8 U.S.C. § 1447. Jurisdiction of the court is premised on 8 U.S.C. § 1421. The naturalization examiner has recommended that Mr. Valad's petition be denied on the grounds that he has failed to establish that he is and has been a person of good moral character as required by law.

The Court having conducted the appropriate hearing, and having considered the record established at the hearing before the examiner, concludes as follows. Hassan Mirshah Valad, a native of Iran, first came to the United States more than twenty years ago and is presently a teacher at Pennsylvania State University. His record of obedience to the criminal law in the various states of the Union as well as the laws of the United States is marred only by two minor traffic violations for which he was assessed monetary fines. The naturalization examiner's recommendation is premised on an admitted failure on the part of the petitioner to obey a lawful order of the Circuit Court of Montgomery County, Maryland directing him to provide $100.00 per month for the support and maintenance of a minor son.

The applicable legal standard is well settled: "In determining the good moral character of a person for a period as required by law, all of the facts must be considered and the standard must be considered together with any extenuating circumstances surrounding thereto." *In re Petition for Naturalization of Abraham Spak*, 164 F.Supp. 257, 260 (E.D.Pa.1958).

 Moreover, the Court must ascertain whether petitioner's conduct coincides with the generally accepted mores of the average citizen in the community wherein he resides, and if it does not so coincide, his conduct must be such as to be in accordance with the "common conscience" of the country as a whole. *See In re Petition for Naturalization of Spak, supra.* Accordingly, the Court is of the view that a husband and father has not only moral and marital obligations in the eyes of the community to provide for a minor child, but also an absolute legal obligation to do so. *See United States v. Konevitch*, 67 F.Supp. 250, 252 (M.D.Pa.1946).

The sad saga of petitioner's dilemma has its genesis in his marriage to one Paula T. Valad on May 13, 1961. On September 12, 1962 a son was born of this marriage. The parties resided together until 1968 when an acrimonious separation ensued, culminating in a final decree of divorce on July 1, 1970. As a consequence of the divorce, the Circuit Court of Montgomery County, Maryland directed the petitioner to provide $100.00 per month for the support and maintenance of his minor son while granting to him the right of visitation for a period of one weekend per month.

The record before the Court is replete with evidence of extreme bitterness between Valad and his former wife, Paula. The Court finds that petitioner, pursuant to the divorce decree, forwarded support money as required for a period of several years, but encountered extreme difficulty securing

the visitation rights to which he was entitled under the divorce decree.

Under the facts solicited by the hearing examiner and by this Court at the ore tenus hearing conducted before it, it is obvious that the difficulties that ensued were exacerbated by the fact that petitioner was living several hundred miles away from the child and his former wife, which to a great extent affected his ability to see the child. Indeed, the record reflects that he frequently would seek the right to be with his child to coincide with business trips that he took to the Washington, D. C. area where the child and his former wife resided. His former wife testified, however, that he rarely gave her sufficient notice of his desire to visit the child. He, on the other hand, contended that when he sought visitation his ex-wife would "come up with some kind of an·excuse making visitation impossible":

Q. Did your wife object to your seeing your child at all or did she object to the methods using time elements and things of that nature?

A. No, sir. Time elements has nothing to do with it. I am under oath, so I can testify that I have called numerous times and each time she would come up with some kind of an excuse. I called her and I'd say I'd like to see him and she would say, well, he has an exam this weekend and call next weekend. So I called next weekend and she would say, well, he's playing basketball at school, call next weekend. I called next weekend and she would say, well, he actually has a cold, call next weekend. I called next weekend and she would say, we're going to New Jersey to the beachhouse, why don't you call next weekend. This was going on for a while. Any fool can see that, you know, she had no intention of letting me see the child, so why aggravate the situation. The matters are merely an excuse that she comes up with.

Indeed, the former Mrs. Valad, when questioned as to whether she ever told the petitioner that he could not see his child, testified before the hearing examiner:

A. I told him on some occasions when the child was ill or had other things to do. I asked the child if he wanted to see his father or partake in the events that he was supposed to be involved in. My son made the choice most of the time.

Q. Did there ever come a time that you told Mr. Valad you didn't want him coming to see the child at all any more?

A. There was a time, after this event in 1971, I didn't want him to be involved in seeing the child . . . .

. . . . .

Q. The child told you he didn't want to see his father?

A. I asked him whether he wanted to see his father and if he was free. It was a matter of whether he wanted to see him or not; if he had something else scheduled for an activity or if I had an activity which could not have allowed me to arrange for a visitation, then I told him no.

. . . . .

Q. Would you encourage your son to see his father?

A. I don't believe I want to answer that question. . . .

Q. During this period of time, did you encourage any sort of relationship between Mr. Valad and his son?

A. I don't look on it as my duty to encourage a relationship between Mr. Valad and his son.

Q. Well, at that time the child was nine years old. Didn't you feel that it was your duty, at that time, to encourage some relationship between them?

A. I don't think that I had a duty as far as Mr. Valad is concerned.

The evidence further reflects that Mr. Valad, erroneously in the Court's view, ultimately stopped forwarding the $100.00 per month under a misguided theory that if the former Mrs. Valad would not obey the court's decree regarding his right of visita-

tion, he was under no duty to continue the monetary payment.

The Court is not unmindful that the record demonstrates disagreement between the parties as to the actual amount of support payments that were made by petitioner. At least at one point the former Mrs. Valad claimed that petitioner was $1,500.00 in arrears, yet the trial judge found the appropriate figure to be $800.00. Additionally, the record reflects that the child's physical needs were amply met by his mother. After the separation between the parties the child was entered in a private school where the tuition was approximately $2,000.00 per year. There is not a scintilla of evidence in the record to indicate that the lack of the $100.00 per month called for by the divorce decree had any significant effect upon the support of the child.

None of this, of course, is to condone Mr. Valad's misconception of his obligation to contribute to the support of his child. While it is regrettable that both petitioner and his ex-wife are apparently committed to acrimony toward each other to such an extent that Valad's relationship with his son has been adversely affected, to conclude that Valad is not a person of good moral character would be to ignore human emotions.

Indeed, subsequent to his divorce from the child's mother, Mr. Valad married a British subject from whom he is now separated and who lives in England with a child of this second union. The evidence is uncontradicted that Valad contributes on a regular basis to the support of this child. Additionally, the evidence reflects that Valad sought the help of third parties in attempting to reach an accommodation with his former wife regarding visitation and support money, all to no avail.

The witnesses who appeared before the Court at the final hearing testified to Valad's reputation for good moral character. The instant record reflects that at one point both Mr. Valad and his former wife charged each other with contempt of court for their alleged respective failures to abide by the divorce decree. The court found each not guilty.

■ Were this Court not satisfied from the record before it that petitioner's failure to continue to have made the $100.00 payments called for in the divorce decree had little effect, if any, on his child's physical well-being, this petition for naturalization would be rejected out of hand. The record satisfies the Court, however, that petitioner's reaction to what he conceived as unfair treatment at the hands of his former wife in reference to his right to enjoy the companionship of his son, coupled with the bitter attitudes exhibited between petitioner and Mrs. Valad, led him to a state of frustration of great magnitude.[1] To succumb to those frustrations, in the Court's view, does not warrant a conclusion that he has failed to establish good moral character in light of the manner in which he has generally conducted himself since his arrival in this country in 1958.

The Court concludes from the evidence and exhibits adduced at the hearing that petitioner has established good moral character during the period required by law; he will be admitted to citizenship upon his taking the statutory oath of allegiance.

An appropriate order shall issue.

---

1. Hatred comes from the heart; contempt from the head; and neither feeling is quite within our control. *Bartlett's Familiar Quotations*, 563 (14th ed.).