[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 4, 2005
THOMAS K. KAHN
CLERK

No. 04-10144

D. C. Docket No. 02-22057-CV-AJ

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LIONEL JEAN-BAPTISTE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(January 4, 2005)**

Before BIRCH, KRAVITCH and CUDAHY[*], Circuit Judges.

CUDAHY, Circuit Judge:

_____

[*]Honorable Richard D. Cudahy, United States Circuit Judge for the Seventh Circuit,
sitting by designation.

The right to acquire United States citizenship is precious and coveted and its successful exercise rarer than many aspirants would hope for. *See Fedorenko v. United States*, 449 U.S. 490, 505 (1981). Accordingly, when the government seeks to strip citizenship from one who has acquired it, denaturalization proceedings can have "severe and unsettling consequences." *Id.* Here, we address the question whether a naturalized citizen who committed certain unlawful acts during the statutory period *prior* to taking the oath of allegiance but for which he was indicted, arrested and convicted *after* naturalization stands to lose his precious acquisition for lack of good moral character. Unfortunately, the answer is yes.

I.

Lionel Jean-Baptiste is a Haitian citizen and native who was paroled into the United States on September 10, 1980, and became a permanent resident here on January 1, 1982. He applied for naturalization on November 21, 1994 on the ground that he had been a lawful permanent resident for at least five years. His application was approved on February 13, 1996, and on April 23, 1996, Jean-Baptiste took the oath of allegiance and became a naturalized citizen. Unbeknownst to immigration officials, however, Jean-Baptiste had entangled himself in a conspiracy to distribute crack cocaine at some point between March 17 and March 23, 1995, in violation of 23 U.S.C. § 841(a)(1), 18 U.S.C. § 2, and

2

21 U.S.C. § 846. Jean-Baptiste was indicted for this crime by a grand jury on October 11, 1996, was arrested on October 30, 1996, and was convicted by a jury on January 8, 1997. He thereafter received a sentence of 97 months' imprisonment, five years of supervised release and a $50,000 fine.

Consequently, the United States government sought to revoke Jean-Baptiste's citizenship on the ground that he was barred from establishing "good moral character" under 8 U.S.C. § 1101(f) because he had committed unlawful acts reflecting adversely upon his moral character during the statutory period.[1] The district court granted summary judgment for the government, finding that Jean-Baptiste must be denaturalized for illegally procuring his citizenship in the face of commission during the statutory period of acts sufficient to negate and belie a showing of good moral character. The district court stayed the order of denaturalization so that Jean-Baptiste could pursue this appeal. We review the

---

[1]In its first complaint filed on July 15, 2002, the government initially sought to revoke Jean-Baptiste's citizenship on two other grounds. Count 1 of the complaint alleged that Jean-Baptiste had illegally procured his citizenship because he had lacked "good moral character" during the requisite five-year period in violation of 8 U.S.C. § 1451(a) and was statutorily barred from establishing good moral character under 8 U.S.C § 1101(f)(6) because he had provided false testimony under oath. Count 2 of the complaint alleged that Jean-Baptiste had procured naturalization through willful misrepresentation and concealment of his criminal conduct and that his citizenship should be revoked under 8 U.S.C. § 1451(a). In an amended complaint filed on December 11, 2002, the government added a third count alleging that Jean-Baptiste was barred from establishing "good moral character" under 8 U.S.C. § 1101(f) because he had committed unlawful acts adversely reflecting upon his moral character during the statutory period. Finally, on May 27, 2003, the government filed a second amended complaint dismissing Counts 1 and 2 of the first complaint, and elected to proceed only with Count 3.

3

district court's grant of summary judgment to the government *de novo*. *O'Ferrell v. United States*, 253 F.3d 1257 (11th Cir. 2001).

## II.

An applicant who seeks to become a naturalized United States citizen must fully comply with several statutory prerequisites before taking the oath of allegiance. *Fedorenko*, 449 U.S. at 506. These requirements demand that applicants for naturalization reside continuously in the United States for at least five years after being lawfully admitted for permanent residence; maintain physical presence in the United States for the five years immediately preceding the application date; reside in the United States "from the date of the application up to the time of admission to citizenship"; and during all such periods establish and maintain "good moral character." 8 U.S.C. § 1427(a). In view of these requirements, the district court concluded that applicants had to maintain good moral character at least from the date on which the application was filed until the date the oath of allegiance was taken.[2] We concur in this interpretation.

Once applicants have complied with the arduous naturalization

---

[2]The district court also relied on 8 C.F.R. §316.10(a)(1), which states that "[a]n applicant for naturalization bears the burden of demonstrating that, during the statutorily prescribed period, he or she has been and continues to be a person of good moral character. This includes the period between the examination and the administration of the oath of allegiance."

4

requirements and have taken the oath of allegiance, they are, to use a baseball analogy, safe at home plate. If, however, evidence later comes to light suggesting that citizenship was illegally procured, the government may challenge the naturalized citizen's certificate of citizenship and demand its cancellation. *Fedorenko*, 449 U.S. at 505. But the government bears a heavy burden of proof in denaturalization proceedings, and a court should only revoke citizenship if the government presents "clear, unequivocal, and convincing" evidence establishing that citizenship was illegally procured. *United States v. Koziy*, 782 F.2d 1314, 1318 (11th Cir. 1984) (citing *Fedorenko*, 449 U.S. at 505). When the government succeeds in carrying this heavy burden, a district court *must* revoke citizenship "on the ground that such order and certificate of naturalization were illegally procured." 8 U.S.C. § 1451(a). In these circumstances, a court lacks discretion but is compelled to enter a judgment of denaturalization. *Fedorenko*, 449 U.S. at 517.

## A.

Before addressing the substance of this case, we note that one of Jean-Baptiste's arguments is not relevant to the instant appeal. Jean-Baptiste asserts that the issue before us is whether he illegally procured his citizenship by willfully and knowingly misrepresenting or concealing a material fact during the

naturalization process. But, to the contrary, this case does in fact require us to determine whether Jean-Baptiste pursued citizenship without possessing the requisite good moral character and not to determine whether he committed fraud. Therefore, the only fact relevant to the count contained in the government's second amended complaint is whether Jean-Baptiste, during the statutory period, committed the crime of conspiring to distribute cocaine, thereby negating his possession of good moral character.

B.

Since Jean-Baptiste committed his unlawful acts while his naturalization application was pending, but was convicted of those offenses after he became a naturalized citizen, the specific question here is whether the *commission*, in contrast to the *conviction*, of a crime negates good character during the critical statutory period. While the Immigration and Naturalization Act (INA) does not specifically define what "good moral character" is, it quite explicitly states what it is *not*. Among the entries in a non-exhaustive list of categories of persons who cannot establish good moral character for purposes of the statute are individuals *convicted* of trafficking in controlled substances and those *convicted* of other crimes. 8 U.S.C. § 1101(f)(3), (8). While this section is not directly on point to the present facts because it speaks to *conviction* and not to *commission* of a crime,

6

it does illustrate what types of unlawful behavior may bar an applicant from establishing good moral character in that context, particularly in view of the expansive "catch-all" provision in the last section of 8 U.S.C. § 1101(f). The final section of 8 U.S.C. § 1101(f) contains a "catch-all" provision which cautions that "the fact that any person is not within any of the foregoing classes shall not preclude a finding that for such reasons such person is or was not of good moral character."

Numerous other statutory and regulatory provisions also suggest the contours of a definition of good moral character. Under 8 U.S.C. § 1182(a)(2), which is referenced in 8 U.S.C. § 1101(f)(3), aliens who are inadmissible to citizenship on criminal and related grounds include those who commit or conspire to commit a crime of moral turpitude as well as aliens who assist others in trafficking in controlled substances. In addition, 8 C.F.R. § 316.10, a regulation based on 8 U.S.C. § 1101(f), sets forth additional categories of persons who cannot establish good moral character, including applicants convicted of an aggravated felony, a crime of moral turpitude or a controlled substance violation. The "catch-all" provision of 8 C.F.R § 316.10(b) states that applicants who have *committed* acts adversely reflecting on moral character during the statutory period cannot establish the requisite good moral character.

Jean-Baptiste does not deny that he was required to maintain good moral character from the date of application until he took the oath of allegiance, but he instead claims that he *did* possess good moral character throughout this period. Jean-Baptiste was convicted of knowingly and intentionally conspiring to possess crack cocaine with intent to distribute. This offense is an aggravated felony, a crime of moral turpitude[4] and a controlled substances violation–all categories of offenses the commission of which bar an applicant for naturalization from establishing the requisite good moral character.

The district court narrowed the issue by finding that Jean-Baptiste's failure to establish good moral character was not as an alien who was *convicted* of or who *admitted* trafficking in controlled substances under 8 U.S.C. § 1101(f)(3) or as an alien *convicted* of an aggravated felony under 8 U.S.C. § 1101(f)(8), before the taking of the oath of allegiance. Indeed, at or before the time of his naturalization Jean-Baptiste had not been indicted for, much less convicted of, a drug offense, nor is there evidence to suggest that he had admitted such an act at that time. Thus, the district court seized upon the final "catch-all" section of 8 U.S.C. § 1101(f)(8), in which Congress delegated authority to the former INS to set forth

---

[4]*See In re Khourn*, 21 I & N. Dec. 1041 (BIA 1997) (holding that distribution of cocaine in violation of 21 U.S.C. § 841(a)(1), constitutes a crime involving moral turpitude under 8 U.S.C. § 1251(a)(2)(A)(ii)).

"other reasons" affecting determinations of good moral character. Pursuant to this authority, Congress delegated to the Attorney General authority to issue 8 C.F.R. § 316.10, including §316.10(b)(3)(iii), which states that "the applicant shall be found to lack good moral character if, during the statutory period, the applicant . . . (iii) Committed unlawful acts that adversely reflect upon the applicant's moral character, or was convicted or imprisoned for such acts, although the acts do not fall within the purview of § 316.10(b)(1) or (2)." This regulation is entitled to deference. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984) ("if Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation.") Further, as the district court noted, this determination is supported by case law. *See, e.g., United States v. Kiang*, 2003 WL 24495 (6th Cir. 2003) (unpublished) ("8 C.F.R. § 316.10(c)(1) represents a reasonable interpretation of the statutory requirement of good moral character and is not ultra vires"), *Deluca v. Ashcroft*, 203 F.Supp.2d 1276, 1279 (M.D. Ala. 2002) (8 C.F.R. § 316.10 is a fair interpretation of Congress' intentions); *Jimenez v. Eddy*, 153 F.Supp.2d 1105, 1107 (D. Ark. 2001) (stating that 8 C.F.R. § 316.10(c)(1) is not an arbitrary or capricious interpretation of 8 C.F.R. § 316(a) and § 1101(f)). Accordingly, we affirm the district court's well-

9

reasoned determination that, because he committed a drug offense as established by his later conviction, Jean-Baptiste was precluded under 8 U.S.C. § 1101(f)(8), as elaborated in 8 C.F.R. § 316.10(b)(3)(iii), from establishing good moral character, and was therefore barred from acquiring citizenship.

## B.

In an attempt to escape the consequences of his criminal act, Jean-Baptiste argues that he is not barred by the doctrine of collateral estoppel from asserting that he did not know at the time of his naturalization that he had committed a crime, and contends that he would not have known that participation in the cocaine conspiracy was a crime prior to his arrest and conviction. However, scienter was an element of the crime of which Jean-Baptiste was convicted, and this defeats his present claim of lack of knowledge.

Moreover, Jean-Baptiste's arguments concerning the doctrine of collateral estoppel are also flawed. Collateral estoppel bars a defendant who is convicted in a criminal trial from contesting this conviction in a subsequent civil action with respect to issues necessarily decided in the criminal trial. *See Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 157 (1963); *In re Bilzerian*, 153 F.3d 1278, 1281 (11th Cir. 1998) (defendant convicted of securities fraud was collaterally estopped from challenging issues litigated in criminal trial in subsequent civil

10

action brought by the SEC). For collateral estoppel to apply, the issue in question must be "identical in both the prior and current action," the issue must have been "actually litigated" in the criminal trial, the determination of the issue must have been "critical and necessary to the judgment in the prior action" and the burden of persuasion in the subsequent action cannot be "significantly heavier." *In re Bilzerian*, 153 F.3d at 1281. The district court determined that all of these preconditions had been satisfied and stated that the issue that the government sought to prove in the denaturalization proceeding–Jean-Baptiste's conspiracy to possess crack cocaine with the intent to distribute–was the same issue it sought to prove in the criminal trial; that Jean-Baptiste's commission of this offense was actually litigated and that his conviction was affirmed on appeal; that the commission of the offense was indeed critical and necessary to the criminal judgment; and that the "beyond a reasonable doubt" standard carried by the government in the criminal trial was higher than its burden of "clear, unequivocal, and convincing evidence" in the civil denaturalization proceeding. As a matter of law therefore Jean-Baptiste was precluded from challenging his conviction or his knowledge of having committed the crime.

## C.

In a further attempt to retain his citizenship, Jean-Baptiste alleges that there

11

are sufficient extenuating circumstances to preclude denaturalization for lack of good moral character. He asserts that, if denaturalized and deported to Haiti, he will be placed on a government flight with other Haitian deportees with criminal convictions and then detained and incarcerated by the Haitian government in prisons "unfit for human habitation" because he is a "pariah" who has "lost his chance to live in the United States." (Defendant's Br. at 15). Jean-Baptiste also contends that his wife and children will suffer "extreme hardship" as a result of his deportation, confinement and eventual death in a Haitian prison. (*Id*.).

Though we certainly do not take Jean-Baptiste's concerns about future hardships lightly, they do not involve "extenuating circumstances," which must pertain to his culpability for the drug crime, and its negative impact on his moral character. *See* 8 C.F.R. § 316.10(b)(3); BLACK'S LAW DICTIONARY 236 (7th ed. 1999). Case law discussions of extenuating circumstances in the context of a determination of good moral character establish that such circumstances must pertain to the reasons showing lack of good character, including acts negating good character, not to the consequences of these matters, including the consequences of denaturalization. *See, e.g., Rico v. INS*, 262 F.Supp.2d 6 (E.D.N.Y. 2003) (finding that a naturalization applicant who did not show extenuating circumstances affecting his DWI conviction in the statutory period

12

could not establish good moral character because he failed to accept responsibility for his crime, failed to establish a claimed rehabilitation and lacked candor); *In re Briedis*, 238 F.Supp. 149 (N.D. Ill. 1965) (discussing extenuating circumstances that made the adulterous conduct of the naturalization applicant "merely technical"); *Petition of Spak*, 164 F.Supp. 257 (D.C. Pa. 1958) (finding that naturalization applicant lacked good moral character and no extenuating circumstances explained his failure to provide support for his mentally deficient child for three and one-half years). Jean-Baptiste has therefore failed to establish extenuating circumstances going to the reasons for his denaturalization. He may pursue further his serious concerns noted above if he becomes subject to administrative removal proceedings under 8 U.S.C. § 1229a.

IV.

In the words of the late Supreme Court Justice Hugo Black, United States citizenship is certainly "no light trifle to be jeopardized." *Afroyim v. Rusk*, 387 U.S. 267-68 (1967). Nonetheless, upon determining that a naturalized citizen illegally procured citizenship, the district court lacked discretion to withhold an order of denaturalization, with all its negative consequences for the denaturalized person and his family. Because Jean-Baptiste, through his commission of a serious crime, lacked the good moral character requisite for naturalization, we

13

must find under 8 C.F.R. § 316.10(b)(3)(iii) that his citizenship was illegally procured, and so we must AFFIRM the judgment of the district court.