FILED
United States Court of Appeals
Tenth Circuit

June 21, 2017

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

BENSON HSU, a/k/a Hung Yen Hsu, a/k/a
Charles Hsu,

     Defendant - Appellant.

No. 16-4171
(D.C. No. 2:14-CV-00077-DN-DBP)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **HOLMES**, and **PHILLIPS**, Circuit Judges.
_____

In this immigration case, Benson Hsu appeals from a district court order that granted the government's summary-judgment motion and revoked his naturalization on the basis that it had been illegally procured. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

_____

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

BACKGROUND

Hsu was born in Taiwan in 1948. In 1989, he was admitted to the United States as a lawful permanent resident.

In March 1993, Hsu travelled back to Taiwan. Upon arriving at the airport, Taiwanese customs agents searched his luggage and found a disassembled and unloaded 9mm handgun along with 40 rounds of ammunition. The items were individually wrapped in aluminum foil and placed in an amplifier and speakers. Hsu provided varying false explanations for possessing the items.[1] He was arrested and ultimately convicted of transporting controlled items without authorization, transporting a handgun without authorization, and transporting bullets without authorization. He appealed and returned to the United States in June 1993.

The Taiwan High Court concluded that Hsu "inten[ded] to transport" the items, Aplt. App. at 67, and it upheld his conviction on the charge of transporting a handgun without authorization. But it concluded that the other charges were committed "simultaneously" and "belong[ed] to one act," justifying punishment for only one crime. *Id.* at 68. The court sentenced Hsu in absentia to five years in prison. Warrants were issued for his arrest in April and May 1994.

---

[1] Hsu claimed that the luggage belonged to a man seated next to him on the plane (but the plane's passenger list showed that two women sat next to Hsu); that the luggage was actually his own, but not the amplifier and speakers found inside; that he was entering Taiwan for the first time; and that he had no relatives in Taiwan (Hsu's brother lived in Taiwan).

A few months later, on September 28, Hsu was arrested in Texas on suspicion of aggravated assault with a deadly weapon and unlawfully carrying a weapon. The same day, Hsu signed an application to become a naturalized U.S. citizen. In his application, which was prepared by his attorney and filed in October 1994, Hsu denied ever being "arrested, cited, charged, indicted, convicted, fined or imprisoned for breaking or violating any law or ordinance excluding traffic regulations[.]" *Id.* at 116 (italics omitted).[2]

The former Immigration and Naturalization Service (INS) interviewed Hsu in February 1995. Hsu claims that the interview lasted only a few minutes and he does not recall being asked about his criminal history. The INS approved Hsu's application in March. Hsu took the oath of allegiance in June 1995.

The next month, in July 1995, Hsu was formally charged in the Texas gun incident for only unlawfully carrying a weapon, a violation of Tex. Penal Code § 46.02(a). He pled guilty to that charge in October 1995. The aggravated-assault component of his earlier arrest had apparently "stemmed from a false accusation or a 'joke' from a former friend who called the police." *Id.* at 115.

In February 2014—nearly nineteen years after Hsu became a U.S. citizen—the Government initiated denaturalization proceedings in federal district court. In its complaint, the government alleged three grounds on which to revoke Hsu's naturalization: (1) Hsu had illegally procured naturalization because he was ineligible for

---

[2] At his deposition, Hsu could not remember whether he signed the application before or after his arrest in Texas.

3

that process due to his Taiwanese and Texas crimes, which reflected adversely on his moral character; (2) Hsu had illegally procured naturalization by making false statements under oath about his criminal history; and (3) Hsu had concealed and willfully misrepresented his criminal history. The Government sought summary judgment on grounds one and three.

A magistrate judge recommended granting the Government's motion on ground one, reasoning that "Hsu's crime of illegally transporting a weapon . . . into Taiwan adversely reflects upon his moral character," *id.* at 226, and there were no extenuating circumstances excusing his conduct, *id.* at 229-30. The magistrate judge did not mention Hsu's Texas conviction. Hsu objected to the characterization of his Taiwanese offense, but did not contest the recommendation as to extenuating circumstances.

The district court adopted the magistrate judge's recommendation in its entirety, agreeing that "Hsu's willing disregard of [Taiwanese] law . . . adversely reflects upon his moral character." *Id.* at 269. Accordingly, the court granted the Government's motion and revoked Hsu's naturalization.

## DISCUSSION
### I. Standard of Review

"We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

4

## II.  Revocation of Naturalization

The Supreme Court has identified two competing considerations regarding the revocation of naturalization.  On the one hand, "the right to acquire American citizenship is a precious one and . . . once citizenship has been acquired, its loss can have severe and unsettling consequences."  *Fedorenko v. United States*, 449 U.S. 490, 505 (1981).  Accordingly, the Government is tasked with the heavy burden of providing "evidence justifying revocation of citizenship" that is so "clear, unequivocal, and convincing" that it does "not leave the issue in doubt."  *Id.* (internal quotation marks omitted).  On the other hand, failure to strictly comply "with all the congressionally imposed prerequisites to the acquisition of citizenship . . . renders the certificate of citizenship 'illegally procured,' and naturalization that is unlawfully procured can be set aside."  *Id.* at 506; *see also* 8 U.S.C. § 1451(a) (providing that naturalization may be revoked if "illegally procured").  Indeed, "once a district court determines that the Government has met its burden of proving that a naturalized citizen obtained his citizenship illegally . . . , it has no discretion to excuse the conduct."  *Fedorenko*, 449 U.S. at 517.

At issue in this case is whether Hsu was "a person of good moral character" for the five-year period preceding the filing of his naturalization application and continuing until he took the oath of allegiance.  8 U.S.C. § 1427(a).  Because without good moral character, Hsu was ineligible for naturalization.  *See id.*

Congress has identified various classes of persons who per se lack good moral character.  *See* 8 U.S.C. § 1101(f) (ranging from "habitual drunkard[s]" to persons "engaged in . . . Nazi persecution").  But even if a person does not fit within one of the

5

enumerated classes, that does "not preclude a finding that for other reasons such person is or was not of good moral character." *Id.* In particular, if a person does not fall within an enumerated class, he must nevertheless be found, in the absence of "extenuating circumstances," to "lack good moral character if" he "[c]ommitted unlawful acts that adversely reflect upon [his] moral character, or [he] was convicted or imprisoned for such acts." 8 C.F.R. § 316.10(b)(3)(iii).[3] This determination must be made "on a case-by-case basis taking into account the . . . standards of the average citizen in the community of residence." *Id.* § 316.10(a)(2). Even if the person's conduct does not qualify as a crime involving moral turpitude (CIMT), he may still be found to lack good moral character. *See* 8 C.F.R. § 316.10(b)(3)(iii).[4]

---

[3] "This regulation is entitled to deference." *United States v. Jean-Baptiste*, 395 F.3d 1190, 1194 (11th Cir. 2005) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984)); *accord United States v. Suarez*, 664 F.3d 655, 661 (7th Cir. 2011).

[4] In cases where courts must determine whether a person's offense qualifies as a CIMT, courts apply what "is called the categorical approach." *Flores-Molina v. Sessions*, 850 F.3d 1150, 1158 (10th Cir. 2017) (internal quotation marks omitted). That "approach requires ignoring a [person's] actual conduct and examining only the minimum conduct needed for a conviction under the relevant . . . law." *Id.* (ellipsis and internal quotation marks omitted). The categorical approach is necessarily inapplicable in the moral-character context of 8 C.F.R. § 316.10(b)(3)(iii). *See Ampe v. Johnson*, 157 F. Supp. 3d 1, 20 (D.D.C. 2016). This is so because, when evaluating whether a person lacks good moral character under this regulation, a court must examine a person's actual conduct to resolve the character issue on a case-by-case basis while considering any extenuating circumstances that "pertain to the reasons showing lack of good character, including acts negating good character," *Jean-Baptiste*, 395 F.3d at 1195. Thus, we do not employ a categorical approach to determining whether Hsu's Taiwanese crime reflected adversely on his moral character. And like the district court, we limit our consideration to the Taiwanese crime.

6

Against this legal backdrop, Hsu argues that his crime of transporting a gun into Taiwan without authorization does not adversely reflect upon his moral character. He asserts that "[t]here is nothing inherently immoral in such an act," Aplt. Opening Br. at 13-14, and that the average person in Texas, where Hsu lived at the time of his naturalization, would have "view[ed] [his] unlawful act as bad judgment, not bad character," *id.* at 16. The government responds that "Hsu's actions involve intentional conduct that demonstrates [his] willful disregard of [Taiwanese] law." Aplee. Br. at 12. We agree with the government.

By itself, the mere transportation of an unloaded gun and bullets inside luggage is not intrinsically bad. Indeed, the U.S. Transportation Security Administration (TSA) permits the transportation of an unloaded firearm and ammunition in checked luggage if they are properly secured and declared when the luggage is checked in at the ticket counter. *See Transporting Firearms and Ammunition*, https://www.tsa.gov/travel/transporting-firearms-and-ammunition (last visited June 6, 2017) (stating that "unloaded firearms in a locked hard-sided container [are permitted] as checked baggage only"); 49 C.F.R. § 175.10(a)(8) (allowing "[s]mall arms ammunition for personal use carried by a . . . passenger in checked baggage only, if securely packed in boxes or other packagings specifically designed to carry small amounts of ammunition"). The problem for Hsu, however, is that his failure to obtain *authorization* from the Taiwanese government before transporting the items does adversely reflect on his moral character.

Hsu seems to argue that his failure to obtain prior authorization is not morally suspect unless he did so intentionally. He does not claim he acted unintentionally. Nor could he, given that he (1) separately wrapped the gun and bullets in foil and surreptitiously placed them in an amplifier and speakers inside his luggage; and (2) lied to the Taiwanese customs agents—even claiming that he had never been to Taiwan before—when they discovered the items. We doubt this conduct, which shows a willful attempt to skirt another country's firearm-transportation laws, is consistent with the standards of the average Texan.[5]

Hsu alternatively argues that his "violation [of Taiwanese law] does not include any reference to intent," and therefore, "any of the extraneous circumstances preceding or following his unlawful acts . . . are irrelevant." Reply Br. at 3. This assertion fails for two reasons. First, determining whether a person has committed an act adversely reflecting on moral character necessarily requires inquiry into the circumstances surrounding the act. *See* 8 C.F.R. § 316.10(a)(2) (directing that "good moral character" be evaluated "on a case-by-case basis"). Second, the Taiwan High Court found that Hsu acted with "intent to transport," Aplt. App. at 67, and it relied on Hsu's deceptive statements to customs officers "as sufficient proof that" his argument that he did not

---

[5] Hsu asserts that "a willful disregard of the law in general" cannot "adversely reflect[ ] on one's character." Aplt. Opening Br. at 19. He explains that the willful violation of a minor traffic law, for instance, should not impugn a person's character under § 316.10(b)(3)(iii). But we are not applying this regulation in the abstract. Rather, the willful disregard of law that occurred here concerned another country's gun-transportation laws, which is quite distinguishable from a minor traffic offense (as demonstrated by the five-year prison sentence Hsu received).

commit a crime was "fabricated" and "not acceptable," *id.* at 68.  While Hsu is correct

that Taiwan's firearm-transportation statute did not itself mention the requisite mens rea,[6]

the General Provisions of the Taiwan Criminal Code did, requiring the "intentional[ ] . . .

accomplishment of the constituent elements of a[ ] [penal] offense."  *Id.* at 209-10.[7]

Hsu adds that his conduct did not "put any person or property at risk."  Aplt.

Opening Br. at 18.  Even if that were true, it does not negate that he transported the gun

and bullets in violation of Taiwanese law and tried to evade responsibility by lying to

authorities.  Nothing in 8 C.F.R. § 316.10(b)(3)(iii) limits "acts that adversely reflect

upon . . . moral character" to those posing a risk of harm to person or property.  *See, e.g.*,

*United States v. Salama*, 891 F. Supp. 2d 1132, 1140-41 (E.D. Cal. 2012) ("insurance

fraud . . . adversely reflected on [naturalized citizen's] moral character" and "bar[red]

him from establishing his good moral character"); *Khamooshpour v. Holder*, 781

F. Supp. 2d 888, 896-97 (D. Ariz. 2011) (same regarding "willfully violating the United

States embargo of Iran"); *United States v. Lekarczyk*, 354 F. Supp. 2d 883, 887 (W.D.

Wis. 2005) (same regarding "bank fraud, forgery-uttering and bail jumping").

---

[6] As reported in the Taiwan High Court's decision, "Section 2, Article 7 of the Provisions Governing Control for Gunpowder and Sword [states]:  Any person without authorization who manufactures, sells, or transports rifles, horse pistols, or handguns, or various types of bombs, shall be sentenced to imprisonment for over five years."  Aplt. App. at 69.

[7] The Taiwan Criminal Code also imposed penal responsibility for negligence "if specifically so provided."  Aplt. App. at 209.  And it defined negligence as "fores[eeing] that [an] act could accomplish the constituent elements of an offense, [but] firmly believ[ing] that such accomplishment would not occur."  *Id.* at 210.  We agree with the magistrate judge that "whether the crime [of unlawfully transporting a firearm] requires intent [or negligence] is not dispositive, as the nature of Hsu's crime adversely reflects upon his moral character."  *Id.* at 226.

9

We conclude that the district court correctly determined that there is no genuine issue of material fact as to whether Hsu's Taiwanese crime adversely reflected on his moral character. Although "extenuating circumstances" may be used to preclude denaturalization for lack of good moral character, *see* 8 C.F.R. § 316.10(b)(3), Hsu only summarily suggests that a lack of harm to person or property "creat[es] extenuating circumstances," Aplt. Opening Br. at 18. We generally do not "consider . . . issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) (internal quotation marks omitted). In any event, because Hsu did not object to the magistrate judge's rejection of extenuating circumstances, Hsu has waived that argument. *See United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060-61 (10th Cir. 1996).

## CONCLUSION

The judgment of the district court is affirmed.

Entered for the Court


Gregory A. Phillips
Circuit Judge

10