JOHN K. BUSH, Circuit Judge, dissenting.
DISSENT
When a person pleads guilty, his world is turned upside down. Because the plea surrenders certain constitutional rights, it *327 must be voluntary and intelligent. And if the plea is in federal court, the defendant must be told of particular consequences as required by Federal Rule of Criminal Procedure 11. This recital helps ensure that the defendant knowingly pleads of his own free will. But the sentencing court need not tell the defendant all the ways in which the plea could change his life. See, e.g. , King v. Dutton , 17 F.3d 151, 153 (6th Cir. 1994) ("[T]he trial court is under no constitutional obligation to inform the defendant of all the possible collateral consequences of the plea.").
The majority holds that a United States citizen's substantial rights may be affected by the district court's failure to read a warning that speaks only to "a defendant who is not a United States citizen." Fed. R. Crim. P. 11(b)(1)(O) (emphasis added). The omitted warning admonishes that a non-citizen "may be removed from the United States, denied citizenship, and denied admission to the United States in the future." Ibid. The warning says nothing about denaturalization. Yet the majority concludes that we must allow the defendant to withdraw his plea because the omitted warning could have prompted him to think of denaturalization consequences and because, had he done so, there is a reasonable probability that he would have rejected the plea agreement.
I disagree for two reasons. First, because the warning by its plain terms does not apply to United States citizens like Ataya, I do not agree that the failure to warn affected Ataya's substantial rights. A warning that speaks only to non-citizens does not make citizen -defendants aware of risks to which only citizens are susceptible, so it is not "reasonably probable" that Ataya would have proceeded to trial but for the failure to warn. United States v. Dominguez Benitez , 542 U.S. 74, 82, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004). Second, even if the warning would have made Ataya aware of the risk of denaturalization, the record still fails to support a reasonable probability that he would have rejected the plea agreement if aware of that risk. Respectfully, I dissent.
I
The district judge's failure to recite all the consequences for which Rule 11 requires warnings is not necessarily a reason to allow the defendant to withdraw a guilty plea. To be sure, a federal sentencing court is always in error when it fails to issue the proper Rule 11 warnings. But not all errors, however easy to avoid, warrant reversal: under plain-error review, the district court's noncompliance must affect the defendant's substantial rights. The error must have affected the defendant such that it is reasonably probable "that, but for the error, he would not have entered the plea." Dominguez Benitez , 542 U.S. at 82, 124 S.Ct. 2333.
As the majority acknowledges, see Maj. Op. 323-24 n.3, the Constitution does not require a sentencing court to warn of denaturalization, see El-Nobani v. United States , 287 F.3d 417, 421 (6th Cir. 2002), nor does Rule 11 require such a warning. By omitting such a requirement, the drafters of Rule 11 made a policy decision that governs our application of the Rule. 1 Given *328 that Ataya h ad no right under Rule 11 to be advised by the sentencing judge of the im migrati on-law consequences of the plea that did apply to him, his substantial rights were not affected by the judge' s failure to warn about immigration-law consequences that did not pertain to him. Indeed, the Rule 11(b)(1)(O) warning, had it been given, could have been counterproductive: because the warning mentions only non-citizens, it is possible that Ataya would hav e understood the warning as giving an implicit (albeit false) assurance that there was no risk of adverse immigration consequences to him, a United States citizen.
There is good reason not to craft a new rule, as the majority opinion implicitly does, that allows a defendant to withdraw a plea based on the failure to read an inapplicable warning. Consider, for example, an analogous situation in which a district court fails to give a defendant the Rule 11 warning about "the court's authority to order restitution," but does so in a case in which the district court does not order any restitution. So far? No harm, no foul: the warning should have been given, but the failure to warn has not affected the defendant's substantial rights. But presume that subsequently, the defendant learns that he is at risk of civil liability-a risk that is not cautioned against in the Rule 11 warnings but that is, the defendant may argue, close enough to the risk of a restitution order that the failure to warn of that risk affected his substantial rights. May the defendant now withdraw his guilty plea on the grounds that, if only the sentencing judge had warned him about restitution, he would have been on notice as to the risk of civil liability, thus making his plea involuntary? The answer should be no. But it is not a stretch to see how the majority's opinion today could be used to support, if not compel, an affirmative answer to that question in a future case.
II
Even assuming the Rule 11(b)(1)(O) warning would have made Ataya aware of the risk of denaturalization, I part ways with the majority's assertion that the record before us demonstrates that Ataya has met his burden to prove that there is a "reasonable probability" that, if only the district court had provided the warning, he would not have pleaded guilty. See Dominguez Benitez , 542 U.S. at 76, 124 S.Ct. 2333. The Supreme Court has cautioned us that we "should not upset a plea solely because of post hoc assertions from a defendant about how he would have pleaded ... [but] should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." Lee v. United States , --- U.S. ----, 137 S.Ct. 1958, 1967, 198 L.Ed.2d 476 (2017).[2] Weighing Ataya's contemporaneous reasons for accepting the plea agreement against his reasons for proceeding to trial shows that he has failed to meet his burden.
When considering Ataya's reasons for accepting the plea, we must be aware that because "defendants obviously weigh their prospects at trial in deciding whether to accept a plea," and because a "defendant without any viable defense will be highly likely to lose at trial[,] ... a defendant facing such long odds will rarely be able to *329 show prejudice from accepting a guilty plea that offers him a better resolution than would be likely after trial." Id. at 1966 (emphasis added). When we look to the entire record, as we may do when determining the likelihood that a defendant would have rejected a plea agreement, see United States v. Vonn , 535 U.S. 55, 59, 122 S.Ct. 1043, 152 L.Ed.2d 90 (2002), it is apparent that had Ataya forgone the benefits of his plea agreement,[3] he very likely would have lost at trial.[4] This is not that "rare" case noted in Lee .[5]
We weigh these considerations against those Ataya would have had for rejecting the plea agreement, had he known about the potential denaturalization risk. Because, as Ataya concedes, "the record is completely silent as to potential immigration consequences," Appellant's Br. 14, or indeed any weighted preferences Ataya may have had concerning denaturalization and his plea agreement, the majority cites general considerations, including the seriousness of denaturalization and the severity of the conflict in Ataya's native Syria.[6]
Denaturalization is a serious consequence, but the likelihood of Ataya's being denaturalized is unclear. Unlike removal in the case of a non-citizen, which is often a mandatory and automatic consequence of a guilty plea, see 8 U.S.C. § 1227(a), denaturalization requires the initiation of a suit by the United States against Ataya-and it requires the United States to win that suit.[7] More importantly, whatever motivational force the fear of denaturalization may have had for Ataya, the instant case could not have materially added to that force, for when Ataya accepted his plea deal, he was already scheduled to stand trial in state court for multiple counts of delivering a controlled substance and delivering a controlled substance causing death, convictions of which would have subjected him to the same possibility of *330 denaturalization.[8] See United States v. Jean-Baptiste , 395 F.3d 1190, 1191 (11th Cir. 2005) (holding that engaging in a narcotics-distribution conspiracy prior to being naturalized, and being convicted post-naturalization, are sufficient grounds for denaturalization).
Absent any evidence in the record that accepting this plea agreement created a real, significantly additional risk of denaturalization, I cannot conclude that Ataya would have considered this attenuated possibility to be so determinative as to create a reasonable probability that, but for the district court's failure to give the Rule 11(b)(1)(O) warning, he would not have pleaded guilty.
And while the conflict in Syria is indeed serious, Ataya has not shown that denaturalization would require his return to Syria. Even were he to be denaturalized, Ataya's ties to other countries would likely provide him with alternatives. The record reveals that Ataya has immediate family in Egypt (where his parents and four siblings reside), Sweden (where two siblings reside), and the United Arab Emirates (where one sibling resides). So even if he were denaturalized, the probability of which is unclear, it is far from certain that he would then face exile to Syria specifically.
In short, Ataya would almost certainly have lost at trial, he received substantial benefit from accepting the plea agreement, and the danger of denaturalization is uncertain and remote. To the extent that he faces a risk of denaturalization, that risk already existed in large part before the plea because of the pending state charges. Even if we could hold that it is reasonable to infer that the appropriate Rule 11(b)(1)(O) warning would have caused Ataya to become aware of potential denaturalization risks, the evidence that Ataya nevertheless would have accepted the plea agreement after weighing the overwhelming evidence of his guilt and the attenuated danger of denaturalization forestalls the conclusion that there is "a reasonable probability that, but for the error, he would not have entered the plea."
III
This discussion in no way condones the district court's failure to give each of the required Rule 11 warnings to Ataya. It must be repeated, once again, "that compliance with Rule 11 is not a difficult task." United States v. Pattee , 820 F.3d 496, 503 (2nd Cir. 2016). "[E]rrors can be avoided if a district or magistrate judge has a standard script for accepting guilty pleas," and "it should be a simple matter for district and magistrate judges to avoid any error by adhering literally to the script required by the Rule." Ibid. While Rule 11 binds judges, responsibility for ensuring that Rule 11 warnings are properly given is not borne entirely by them, for "[p]rosecutors and defense attorneys also have an obligation to make sure that the Rule is followed," and counsel in future cases should take this obligation seriously. Id. at 502.
But the only issue we are asked to decide-whether failure to give the Rule 11(b)(1)(O) warning affected Ataya's substantial rights-is answered by both the policy decision of the drafters of Rule 11 to omit a denaturalization warning and the particular factual record in this case. The sentencing judge's job is to be the referee of the defendant's plea-is it voluntary and knowing?-not a clairvoyant of the defendant's future. Ataya's world undoubtedly *331 would change if his guilty plea stands, but he has not shown that the district court failed to tell him anything about that new world to give us a legally cognizable reason to question the voluntariness and knowingness of the plea.
With due respect to my colleagues, I therefore dissent.

The risk of denaturalization is not the only significant consequence omitted from the Rule 11 warnings. For example, under Rule 11, sentencing judges need not "warn defendants pleading guilty that they may lose their right to vote, to be a juror, to possess a firearm, to obtain professional licenses, student loans, or future employment opportunities." D. Brock Hornby, Over Ruled , 21 Green Bag 2d 17, 19 (2017) (citing CSG Justice Center, National Inventory of Collateral Consequences of Convictions , niccc.csgjusticecenter.org (last visited Aug. 23, 2017); Margaret Colgate Love et al., Collateral Consequences of Criminal Convictions: Law, Policy & Practice §§ 2:1-79 (2016)). Nor must judges warn of losing such things as "access to public housing and rental subsidies, welfare and veterans' benefits, government pensions, ... drivers' licenses, [and] parental rights." Id. at 19 n.10 (citing Hornby, supra ).

Lee was an ineffective-assistance-of-counsel case, but its reasoning applies equally here.

Accepting the plea resulted in the government's dropping a charge under 18 U.S.C. § 371 and Ataya's receiving a three-level reduction in his offense level, which reduced his Guidelines range by roughly three years of imprisonment.

Ataya's four codefendants, who had already pleaded guilty, were presumably available to testify against Ataya had he chosen to go to trial. And, among other evidence, the government had at its disposal taped conversations in which Ataya admitted, in so many words, to engaging in fraudulent activity.

Compare the facts here with those in Lee , in which the defendant and his trial attorney both testified that the defendant would have gone to trial had he been aware of the immigration consequences of his plea and the defendant told the trial judge that he would not want to plead guilty if it could result in his being deported. See Lee , 137 S.Ct. at 1967-68.

The majority also mentions Ataya's relationship with his family, but this relationship is not so unique as to put Ataya in the class of "rare" cases in which prejudice can be shown.

Denaturalization is a consequence that comes neither automatically nor speedily. See 8 U.S.C. § 1451(e) (making denaturalization automatic for conviction under 18 U.S.C. § 1425 only); see, e.g. , United States v. Al-Sibai , 599 Fed.Appx. 251 (6th Cir. 2015) (more than two years passed between the government's initiating a denaturalization suit and the Sixth Circuit's denying defendant's appeal). Civil denaturalization proceedings are initiated only when the United States Attorney for the district in which a naturalized citizen resides determines that she has received an affidavit showing good cause to initiate denaturalization proceedings, 8 U.S.C. § 1451(a), and even then, the citizen is afforded both full protections of a civil trial in which the government is held to a heightened burden of proof and the right to appeal any loss at the trial level, see Kungys v. United States , 485 U.S. 759, 772, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988) (holding that the government must meet its burden with "clear, unequivocal, and convincing" evidence).

The record is silent as to whether Ataya ever stood trial on these charges and, if so, the outcome of that trial.